COURT OF APPEALS OF VIRGINIA

Present: Judges Beales, O'Brien and Senior Judge Annunziata
Argued at Alexandria, Virginia

PUBLISHED

SOFIA KHALID-SCHIEBER, F/K/A
  SOFIA TANWEER HUSSAIN

                                                                OPINION BY
v.      Record No. 1204-18-4                        JUDGE RANDOLPH A. BEALES
                                                              APRIL 30, 2019
HAROON HUSSAIN

                    FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
                              David A. Oblon, Judge

              Rebecca Wade (Wade, Grimes, Friedman, Meinken & Leischner,
              PLLC, on brief), for appellant.

              A. Van McFadden (The McFadden Law Office, PLLC, on brief), for
              appellee.


        This case concerns a review of a trial court's custody modification order regarding the

parties' three children. At the conclusion of *ore tenus* hearings, the trial court entered an order

largely granting father Haroon Hussain's motion for a modification of custody of the children.

Mother Sofia Khalid-Schieber now challenges the custody modification order on appeal.

                                    I. BACKGROUND

        On appeal, we are required to view the facts in the light most favorable to father because

he was the prevailing party before the trial court. See Wright v. Wright, 61 Va. App. 432, 451

(2013). So viewed, mother and father were married in 2001 and had three children together –

daughter S.H., son I.H., and daughter H.H.[1] At the time of the trial court's ruling in April 2018,

S.H. was 15 years old, I.H. was 13, and H.H. was 9.

_____

        [1] We use initials, instead of the children's names, in an attempt to better protect their
privacy.

In the summer of 2011, mother traveled to England with the three children, with father's consent, to visit mother's family. When she stayed longer than planned and father could not get in contact with her, he filed legal action in the Family Division of a court in London that culminated in an order directing mother to return with the children to Virginia, where the family actually lived. Mother returned to Virginia in late December 2011, and mother and father thereafter separated. They eventually entered into a custody agreement in which they agreed to joint legal and physical custody of the three children and in which they established a 50/50 schedule for physical custody. The custody agreement was entered as an order of the trial court on July 25, 2014. On December 22, 2014, the trial court entered a final decree of divorce, which incorporated the provisions of the July 25, 2014 order. In October 2015, mother married Todd Schieber.

On January 20, 2017, father filed a "Petition to Modify Custody of Minor Children" alleging a material change in circumstances and seeking full legal and physical custody of the children. (During the *ore tenus* hearing on April 4, 2018, father modified his request to instead seek only joint legal and physical custody of the older children and to seek sole legal custody and sole physical custody of H.H.) On January 16, 2018, mother filed a "Motion to Modify Custody and Visitation," also alleging a material change in circumstances and seeking sole legal and physical custody of all the children. The motions of mother and father were consolidated, and *ore tenus* hearings on the motions were conducted between April 2, 2018 and April 5, 2018 and on April 9, 2018.[2]

At the *ore tenus* hearings, father testified that, for approximately one month after the finalization of the divorce in December 2014, the parties followed the terms of the custody

---

[2] During these proceedings, the trial court also considered and ruled on an order for mother to show cause why she should not be held in contempt for violating the July 25, 2014 custody and visitation order. The show cause is not at issue in this appeal.

agreement, but that after that point, he began facing difficulties in picking up the children to spend his custodial time with them. According to father's testimony, when he would arrive to pick up the children, the children would often delay for hours, would not cooperate in leaving with him, and would refer to father derisively using pronouns such as "him" rather than using a name for him. He testified that mother would not help or encourage the children to come with him – and essentially encouraged the children not to go with him.

Father also testified that, when the children went to his house, they would not bring along with them the clothes or sports equipment needed for their weekend sports activities, requiring father to return to mother's house to retrieve their necessities. He testified that, when he purchased clothes or other items for the children while they were in his physical custody, the children would take those items back to mother's house so they did not have their necessities when they returned to father's house. He also testified that he began to have the meetings to exchange the children at a police station and that, even there, the children would often refuse to go with him. He testified that he contacted the police on multiple occasions when he was unable to pick up the children for his custodial time. He also introduced into evidence an emergency motion that he filed with the court in July 2017 seeking to prevent the continued denial of his access to the children.

The trial judge found that "Mother and Mr. Schieber, by their own admission, do not encourage the kids to go with father. . . . They want the rebellion from the children who refer to the father as a pronoun." The judge also found that "Mr. Schieber acts like father's not even a human being. He won't even acknowledge his presence. He is modeling poor behavior in front of the kids." In addition, "[n]either the mother, nor Mr. Schieber has been willing to encourage the kids to go with the father, and the children don't want to go with the father" for his scheduled custody time. The trial judge found that these circumstances placed father in an "absolute

- 3 -

no-win situation." The trial judge also found that "exchanges [were] filled with great drama and anxiety."

Mother testified that father abused her and the children. Two police officers who investigated allegations of physical and sexual abuse testified concerning their investigations. Officer Munoz testified that his investigation did not result in bringing any charges, and Detective Cooper testified that, except for one instance, father was not criminally charged and that, even for the one investigation that resulted in charges, those charges were dropped. Two officials of Fairfax County Child Protective Services (CPS) – who conducted assessments investigating allegations of abuse by father – testified that they closed those assessments because they found the claims against father to be unsubstantiated. Father also introduced into evidence documentation from CPS regarding why it closed its investigation into father. He also testified that he did not abuse the children and that, in the various investigations against him, CPS never made any findings of abuse or neglect. After considering the evidence, the trial judge found that "these investigations never resulted in a finding against the father" and that there was "no history of family abuse, despite a large amount of unproven allegations." In fact, the trial judge found that the only allegation of abuse that was proven was that of mother's assault on father during an argument when father began to record mother with his cell phone and mother knocked the phone out of his hand onto the ground. The judge noted that the consequence of the allegations against father, however, was that "[w]hile the allegations go nowhere, because they were false," they have had "the practical effect of separating the kids from the father while they're being investigated, because they must be investigated." The trial court found that, although father did not abuse the children or mother, the children – under mother's influence – "likely now believe they've been abused." In fact, the trial court found:

> the mother had an active campaign to alienate the father from the
> children. The Court finds that [by] convincing the children of

abuse that never happened, and by not actively persuading the children to have a relationship with the father, she effectively denied the father with access to, or visitation with the children. The court finds that the mother schemed to alienate [S.H.] and [I.H.] from the father[, which] was successful. The alienation of [H.H.] from the father is in progress.

Father testified that mother also made decisions concerning the mental health of the children without notifying him. He testified that when I.H. was hospitalized in September 2017, mother delayed in informing father of his hospitalization. According to father's testimony, when father discovered I.H. had been hospitalized and attempted to visit him, father was prevented from doing so by medical staff. In addition, according to father, mother enrolled the two younger children, I.H. and H.H., in mental health treatment without first notifying father.

At the time of the *ore tenus* hearings in April 2018, father testified that he had not seen S.H. since January 2017, had not seen I.H. since March 2017, and had not seen H.H. since June 2017. The trial court made a finding of fact that, during the time that father had "almost zero involvement with the children," the "mother's sole custody result[ed] in distress" to the children. The trial judge found that I.H. suffered from "suicidal ideation and depression," which led to his hospitalization at a psychiatric hospital in September 2017; that both S.H. and I.H. were taking psychiatric medications; and that H.H. had begun to hurt herself. He summarized that, while the three children were solely in mother's care, "the children's mental health is getting progressively worse."

The trial judge also found that mother excluded father from medical and mental health decisions concerning the children. The trial court found, "[M]other and Mr. Schieber wanted to guide things. I find that mother and Mr. Schieber convinced the medical team that the father was a monster, based on incomplete information, resulting in the medical providers . . . effectively excluding him from the serious treatment consultations . . . ." The trial judge also noted that "Mother manipulates treatment providers" and that "it does not appear that the treatment is being

used for treatment; it seems like it's being used for validation. One provider says something, the mother likes, mother accepts it. . . . When a provider says something she doesn't like, she insures failure."

Considering all of the evidence, the trial judge noted, "Almost anything the Court does or doesn't do in this case, is going to result in distress to the children." The trial judge stated, "The parties have left this court with no easy choices." The court found, however, "many material changes of circumstances" to justify a modification of custody and visitation. In delivering his ruling from the bench, the trial judge stated, "I've considered each and every one of the statutory factors of [§ 20-124.3] of Virginia code" and went on to methodically list each of the factors and to provide his findings of fact and some of his reasoning for each of the factors. Ultimately, the court granted father sole legal and physical custody of H.H – and gave joint legal and shared physical custody of S.H. and I.H. to mother and father. Pursuant to the order, S.H. and I.H. were to continue to live with mother, but father had "final decision-making authority to decide on any matter in which there is a dispute between the parties," as well as "sole authority to select healthcare providers and therapists for all of the parties' minor children . . . ." The trial court noted that it considered a variety of options, including reunification therapy and gradual reintroduction of father into the lives of the children, but that such attempts had been unsuccessful with these parties in the past. The court also expressed that the decision "to split up the children [is] an act that it [did] not take lightly at all." However, the court indicated that it feared H.H.'s relationship with father would be undermined by also requiring that the two older children live with father – or spend considerable time with him – until father found that he was prepared to have them spend more time with him and H.H. (and could tell they were not trying to undermine H.H.'s relationship with father). The trial court noted that it was "picking the best of the bad choices, in an effort to protect the best interests of the children," but split up the

children's primary physical custody, fearing that "the older children would only reinforce the mother's narrative and frustrate the reconciliation [of H.H.] with the father."

Mother filed numerous objections and now appeals the trial court's order.

## II. ANALYSIS

On appeal, mother's assignments of error fall broadly into two categories: (1) the trial court abused its discretion concerning the modification of custody in the order that it crafted, and (2) the trial court erred in making findings of fact that were not supported by the evidence.

"In determining whether a change in custody is warranted, the trial court applies a two-part test: (1) whether a change of circumstances has occurred since the most recent custody award; and (2) whether such a change would be in the best interests of the child." Parish v. Spaulding, 26 Va. App. 566, 570-71 (1998). "[T]rial courts are vested with broad discretion in making the decisions necessary to guard and to foster a child's best interests." Farley v. Farley, 9 Va. App. 326, 328 (1990). "A trial court's determination of a child's best interests 'is reversible on appeal only for an abuse of that discretion, and a trial court's decision will not be set aside unless plainly wrong or without evidence to support it.'" Rubino v. Rubino, 64 Va. App. 256, 261-62 (2015) (quoting Farley, 9 Va. App. at 328).

Concerning the trial court's findings of fact, "[w]hen a trial court hears evidence at an *ore tenus* hearing, its factual findings are entitled to great weight and will not be disturbed on appeal unless plainly wrong or without evidence to support them." D'Ambrosio v. D'Ambrosio, 45 Va. App. 323, 335 (2005).

### A. Whether the Trial Court Abused its Discretion in its Custody Modification Order

Mother alleges that the trial court erred in its custody modification order because the custody arrangements of the order were not in the best interests of the children as required by Code § 20-124.3. More specifically, mother argues that (1) the trial court erred in giving father

sole legal and physical custody of H.H. and "tie-breaking authority in decisions" for the older children because he was not capable of assessing and meeting the needs of the children since he had "practically no relationship with them"; (2) the court's order "was designed to punish [mother] rather than to protect the best interests of the children"; and (3) the trial court "failed to consider or give sufficient weight to the relationship of the siblings with each other as required by Va. Code § 20-124.3(4) when the Court ordered [H.H.] to be removed from her siblings with no plan to reunify or encourage contact."

### 1. Capability of Father to Assess the Children's Needs

Mother argues that the trial court erred in awarding father "sole legal and physical custody of [H.H.], and removing her from her Mother's care without evidence that [father] was capable of assessing and meeting her needs, without evidence that doing so would be in [H.H.]'s best interests, and while acknowledging that doing so would cause [H.H.] distress." She also argues that the trial court erred in granting father "tie-breaking authority in decisions for [S.H.] and [I.H.] when there was no evidence that [father] was capable of assessing the children's needs pursuant to Va. Code § 20-124.3(3) and all evidence presented was that he has practically no relationship with them . . . ." The judge found, however, that "prior to [father's] marginalization, [he] had a good relationship with the children," and the eventual marginalization came as a consequence of mother's influence and actions. The judge's findings included a finding that father "has been blocked by the mother from having a relationship with them, via her brand of emotional trauma." The judge also found that mother "is unable to assess the emotional needs of the children. She has harmed the children by reinforcing unbelievable allegations of abuse against them." The trial court found that mother's sole custody of the children while father "has [had] almost zero involvement with the children" has resulted in great distress and worsening conditions for the children. Specifically, while in mother's sole care, I.H. was "admitted to a

mental health hospital, and is [on] psychiatric medications, [S.H.] is on psychiatric medication, [H.H. is] starting to scratch herself." The court concluded that it "can't give custody to the mother. She effectively has sole custody right now, and the children's mental health is getting progressively worse."

These findings by the trial court illustrate that the trial judge weighed the fact that father had not had the opportunity to demonstrate his current ability to assess the needs of the children against the mother's demonstrated inability to meet the medical and mental health needs of the children. After considering these facts, the trial court concluded that giving father the final decision-making authority was in the children's best interests. In its final order, the trial court stated:

> if the Father had the power of legal custody, including medical and social service provider decisions, he could select providers who could improve the health and welfare of all three children and reverse their current negative trajectory because the Mother chooses providers based on who she can influence with incomplete or inaccurate facts.

Thus, while the trial court recognized that father had virtually no contact with the children for months and "has been completely marginalized" from their lives, it ultimately concluded that giving father this final decision-making authority was the best course of action for the older children and that giving him sole custody of H.H. was the best course of action for her. Given the deterioration of the children under mother's sole care, we cannot say that this was an abuse of the trial court's discretion.

Regarding H.H. specifically, there was evidence to show that on various occasions, she would happily spend time with father and her paternal cousins until mother would call. After talking to mother, her demeanor would change and she would start to cry and say she wanted to go home to mother. Over time, H.H. began to act very differently toward father. The trial judge found that H.H. had, in essence, been "cut off" from spending time with her cousins in father's

family. H.H. also began to maintain a "trauma book" listing negative things about father. Concerning this "trauma book," the trial judge concluded that "she was coached" by mother. In short, prior to such negative interference from mother, H.H. enjoyed a good relationship with father. Although at the time of the hearings, father had not seen H.H. for months, the trial judge did not err by concluding that their long-term relationship was such that father could assess her needs and provide appropriate care, as he had done in the past.

2. <u>Whether the Trial Judge's Order "Was Designed to Punish Appellant Rather Than to Protect the Best Interest of the Children"</u>

Mother also claims that "the trial Court erred in crafting an Order which, in its entirety was designed to punish [mother] rather than to protect the best interest of the children." However, the record shows that the court *did* consider the best interests of the children. Furthermore, contrary to mother's argument, to give sole custody to mother would instead have punished *father* for the actions of *mother*, as evidenced from the trial judge's order. The judge decided that outcome was not in the best interests of the children. The trial court clearly decided that mother was, in essence, subordinating the medical and psychological needs of the children to her overall goal of controlling outcomes and "manipulat[ing] treatment providers." Therefore, while the trial court encouraged cooperation between the two parties, it gave father "final decision-making authority to decide any matter in which there is a dispute between the parties . . . after consulting with [mother] by email and considering her opinion of the childrens' [sic] needs[.]"

It is apparent from the record that, in deciding the outcome of the case, the trial judge methodically considered each of the required factors from Code § 20-124.3, various possible outcomes, and the best interests of the children. The trial judge acknowledged, "Almost anything the Court does or doesn't do in this case, is going to result in distress to the children." In crafting its order, the court stated that "[t]his is a family in crisis." In an attempt to

- 10 -

accomplish a "reversal of this family's downward spiral," it chose "the best of the bad choices, in an effort to protect the best interests of the children." The trial judge thoughtfully considered his options, openly acknowledged that the decision before him was not an easy one, and, in light of the required statutory factors, entered the order that he believed was in the children's best interests. We hold that, in doing so, he did not abuse his discretion.

### 3. Consideration of the Importance of the Relationships Between the Siblings

Mother also argues the trial court erred by not giving sufficient weight to the relationship of the siblings with each other as required by Code § 20-124.3(4). That sub-section requires the trial court, when assessing the best interests of the child, to consider the "needs of the child, giving due consideration to other important relationships of the child, including but not limited to siblings, peers and extended family members[.]"

Generally, "[w]here it is reasonably possible, brothers and sisters of tender years should be reared together, and have the full benefit of natural ties of affection and interest that such association develops." Hepler v. Hepler, 195 Va. 611, 623 (1954). However, while the trial court must carefully consider the effect of the separation of siblings, this consideration is only one of many factors that the trial court must consider in making its assessment. See Code § 20-124.3. As this Court has previously held, this one consideration is not paramount to all others. Hughes v. Gentry, 18 Va. App. 318, 323-24 (1994).

Here, the trial court considered all the factors and ultimately decided that separating the children to some extent was necessary to protect the children's best interests. It was within the trial court's discretion to do so consistent with the best interests of the children. See Code § 20-124.3; Rubino, 64 Va. App. at 261-62. The court stated that its decision to send the children to live in different homes was "an act that it does not take lightly at all," and provided some of its reasoning for the decision. The trial judge explained that he "considered

- 11 -

reunification therapy, and gradual reintroduction of the father into the children's lives with increasing visitation. However, that's been tried, and it's been unsuccessful. The mother won't let that happen." The judge also "considered flipping the custody to the father, of all the children . . . ." However, he decided against giving sole physical custody of all the children to father because he believed "the older children would only reinforce the mother's narrative and frustrate the reconciliation with the father." The judge believed that, as the youngest sibling, H.H. was particularly vulnerable to negative influence from her older siblings, and he found the best way to rebuild a relationship with her father was to isolate her, for a limited time, from her older siblings, whom the court found "are afraid [of] or hate the father." The trial judge's order allowed for father to have time to re-establish his relationship with H.H., following which the older siblings could then be allowed to communicate with and spend time with their young sister.

Furthermore, although the trial court order placed the siblings so that they were to *live* with different parents (S.H. and I.H. with mother; H.H. with father), the siblings were not fully separated on a permanent basis. Father was granted sole legal and physical custody of H.H., but mother and father share joint legal and physical custody of the two older children – S.H. and I.H. Although for the first two months following the entry of the order, mother and the older two siblings were not to contact H.H., mother and the two older siblings were permitted to have visitation and contact with H.H on or after July 1, 2018.[3] Indeed, the trial judge explicitly stated that "[t]he parties may mutually agree to additional parenting time for all three children[,] to trading parenting time dates, to relax parenting time conditions," and expressed his hope that "a new arrangement may foster reunification" and that "the weight of the past is left in the past, and the future becomes free of overt conflict." Therefore, the court's order does not necessarily

---

[3] While mother's evening visitation three times per week was required by the order, it was up to father's sole discretion whether the older siblings could attend those visits or have other communication with H.H.

separate the siblings for more than two months but instead provides for contact and visitation between the siblings after the initial period following the entry of the order.

In light of the record before us, which includes extensive factual findings made by the trial judge (which were supported by credible evidence in the record) and ample statements by the judge showing his reasoning and the consideration he gave to determining the appropriate decision, we cannot say that the trial judge abused his discretion in determining what was in the best interests of the three children.

B.  Whether the Trial Court's Factual Findings are Supported by Credible Evidence

Mother's remaining assignments of error contend the trial court erred in its findings of fact.  In short, the remaining assignments of error all assign error to the court's factual findings that father did not abuse mother and children.

"It is well established that the trier of fact ascertains a witness' credibility, determines the weight to be given to their testimony, and has the discretion to accept or reject any of the witness' testimony." Street v. Street, 25 Va. App. 380, 387 (1997) (*en banc*).  "Where, as here, a court hears evidence *ore tenus*, its findings are entitled to the weight of a jury verdict, and they will not be disturbed on appeal unless plainly wrong or without evidence to support them." Gray v. Gray, 228 Va. 696, 699 (1985).  "The decision of the trial judge is peculiarly entitled to respect for he saw the parties, heard the witnesses testify and was in closer touch with the situation than [the appellate] Court, which is limited to a review of the written record." Brown v. Brown, 218 Va. 196, 200 (1977).

This case was heavily fact-intensive.  The *ore tenus* hearings took place over the course of five days and included testimony from more than twenty witnesses.  At the conclusion of the evidence, the judge made extensive findings of fact, including findings on the credibility of mother and father – both of whom testified during the hearings.  The court succinctly stated, "the

- 13 -

Court finds that the father is credible." In contrast, regarding mother's credibility, the trial court stated, "I saw and heard the mother testify in Court. I heard all the other evidence, was able to make assessments about her credibility, and I didn't find her to be credible." The court also elaborated:

> One may not see this on the ultimate transcript of this trial, but when she cried, it appeared to be overacting and scriptive [sic]. The testimony on direct and cross appear to be testimony from two different people. On direct, she was direct, articulate, and charming. The overreacting and over-moding [sic] notwithstanding. On cross, however, she looked like a zombie. In fact, Ms. McFadden had to even ask if she was on medication or something. The transition was live in Court, and full[y] observable.

In addition, the court found, "Mother admittedly lied to the police officer" conducting an investigation into an allegation of abuse and "was forced to admit to the lie, which is one of the reasons why credibility is very low in this Court's eyes."

Allegations of abuse must always be taken seriously and properly investigated, as the trial judge noted was done here through multiple investigations of father. The trial judge listened to the testimony of the investigating officers, who testified that, in all of their investigations against father, only one investigation resulted in criminal charges against him, and those charges were then actually dropped. The trial judge also considered testimony from two CPS officials who investigated the allegations, as well as documents detailing the history of CPS investigations of father – all of which the trial judge found are "investigations that lead nowhere." The trial judge concluded that "the abuse never happened." In fact, the trial judge found that the only substantiated abuse allegation was of mother's assault on father when she knocked a phone out of his hand.

In this case where so much turned on the testimony from the witnesses, including multiple police officers and CPS officials who investigated the many allegations of abuse against

father, the trial court considered the extensive testimony of all of the numerous witnesses and made determinations as to their credibility. Based on the record before us, we cannot say that there is no credible evidence to support the trial judge's findings of fact that father did not abuse mother or the children. Consequently, we will not disturb those findings of fact on appeal.

## III. CONCLUSION

In short, we hold that the trial court did not abuse its discretion in entering the custody modification order as it did. The trial judge considered all of the evidence and found the children to be "in absolute distress." He found there had been a material change in circumstances. He considered all of the factors required by Code § 20-124.3 for determining the best interests of the children in deciding custody – and also considered multiple options for how to modify custody. He then carefully chose what he considered to be the best course of action – placing S.H and I.H. with mother and placing H.H. with father (and directing no contact with H.H. by mother or the older siblings for two months in order to enable father to rebuild his relationship with her). The trial judge indicated that he hoped this "new arrangement" would be helpful in "foster[ing] reunification."

In addition, we cannot say that there is no credible evidence to support the trial court's findings of fact that father did not abuse mother or the children. The judge considered all of the extensive evidence before him (including testimony by over twenty witnesses), weighed the credibility of the witnesses (including finding father to be credible and mother not to be credible), and, accordingly, made the findings of fact that mother on appeal now asserts are error. Given the totality of the evidence, we certainly cannot say that the trial court is plainly wrong or without credible evidence to support its findings of fact on appeal.

For all of these reasons, we affirm the decision of the trial court.

<u>Affirmed.</u>