COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present: Judges O'Brien, Ortiz and Friedman

MEKELL MIKELL

v.      Record No. 0667-24-4

EDWARD MAURICE BURKE

MEMORANDUM OPINION[*]
PER CURIAM
SEPTEMBER 2, 2025

FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Jonathan D. Frieden, Judge

(Adam Fleming, on brief), for appellant.

(Sonya L. Powell; Monica Sameni; Powell Radomsky, PLLC, on
brief), for appellee.


Mekell Mikell (mother) appeals the trial court's judgment awarding Edward Burke (father)

sole legal and physical custody of the parties' minor daughter and granting mother supervised

visitation. Mother argues that the court erred in finding a material change in circumstances since

the last custody ruling. She also contends that modification was not in the best interests of the

child.[1]

BACKGROUND[2]

Mother and father married in 2016 and had one child, S.B., born in 2019. In May 2020

the parties separated, and in June 2020, mother petitioned the Fairfax County Juvenile and

Domestic Relations District Court (JDR court) for both a preliminary protective order and a

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

[1] After examining the briefs and record, the panel unanimously holds that oral argument is
unnecessary because "the appeal is wholly without merit." Code § 17.1-403(ii)(a); Rule 5A:27(a).

[2] "On appeal, we view the evidence in the light most favorable to . . . the party prevailing
below." *D'Ambrosio v. D'Ambrosio*, 45 Va. App. 323, 335 (2005).

protective order against father. Mother's various allegations did not include any acts of physical abuse. The JDR court denied her request for a preliminary protective order and, after a hearing later that month, also denied the petition for a protective order.

A few days later, mother obtained a three-day emergency family abuse protective order against father. On the day it expired, mother again petitioned the JDR court for a preliminary protective order and protective order. This time, mother alleged that while she was in bed with the child, father sexually assaulted her. The JDR court denied mother's request for a preliminary protective order and, after a hearing, also denied her petition for a protective order.

In November 2020, the parties were awarded joint legal and shared physical custody of S.B. They divorced in 2021.

## I. Allegations and Incidents Post-Divorce

In July 2022, the parties signed a consent order permitting each parent to enroll the child in a daycare of their choosing during their respective custodial days. That same month, father was criminally charged with offenses stemming from mother's 2020 allegations. The charges were ultimately nolle prossed over mother's objection.

During an August 2022 appointment, S.B. told her pediatrician that her father had touched her vagina. The doctor reported the allegation to Child Protective Services (CPS).

In October 2022, S.B. began therapy at Sunstone Counseling. Mother reported that the child had night terrors and had claimed, "Daddy touches my vagina." Father "denie[d] abuse of any type," and the therapist noted "no outward appearance[] of abuse" or "direct behavioral issues attributable to any abuse." At the next appointment, mother repeated that the child told her, "Daddy touches my vagina" after returning from father's custody. Father, on the other hand, reported that the child had said, "Mummy and [maternal grandmother] tell[] me that Daddy touches my vagina." CPS was advised of the allegations, and therapy was discontinued during the investigation.

In a forensic interview, the child "stated that daddy touches [her] vagina while at the aquarium with a stick." Mother explained that she "is unsure if the child knows what part of the body [it] is because" the child previously referred to "armpits" as "vagina."[3] CPS determined the complaint was unfounded, and father was not charged criminally.

The child resumed therapy at Sunstone in early December 2022. The next month, child's counselor informed both parents that there were "no behaviors that raise[d] any concern for [the child's] wellbeing at [that] time" and the only concern was the parents' "high conflict relationship." For the benefit of the child's "long term mental health," the counselor recommended that the parents engage in "co-parenting training . . . and/or regular sessions with a co-parenting therapist who specializes in high conflict relationships."

In April 2023, mother moved to amend child custody, visitation, and support, alleging, among other things, that the child "repeatedly" told mother and maternal grandmother that father "touches her vagina."

In July 2023, after being contacted by mother, a detective reported to Fairfax County CPS that S.B. said father "touches and kisses [her] vagina." During a second forensic interview, the interviewer provided instructions to the child, who "immediately stated that 'daddy touched my vagina, and I really did not like it.'" She then claimed that father used "a stick" to touch her vagina daily. The child also stated that "daddy put a water balloon on his penis and splashed me on the face." According to S.B., "Aunt Candance" was in the room at the time, and "Aunt Candance put a water balloon on her penis and splashed [the child's] face." She confirmed that "mommy told her what to say about daddy." CPS eventually concluded its investigation with an unfounded disposition.

---

[3] Father reported a similar experience to the child's pediatrician.

In early August 2023, mother successfully petitioned for an emergency family abuse protective order against father which prohibited him from being in the presence of mother and the child. Mother accused father of committing "horrible [acts of] molestation" against S.B. and stated that she feared father would retaliate against the child because mother had "reported [him] to CPS several times for abusing" the child. Among other things, mother alleged that since 2022, without prompting, S.B. had "repeatedly stated that 'daddy touches my vagina, and I don't like it.'" When the emergency protective order expired, the JDR court granted mother's petition for a preliminary protective order against father based on the same allegations.

Around that time, mother took the child to a hospital emergency room, complaining that child frequently wet the bed, felt "burning" while urinating, and was "complaining of vaginal pain." She told staff that CPS was investigating father for sexually assaulting the child. Mother reported that the child told her that father "kisses [the child] down there," "blows up a balloon and puts it on his penis [and] then puts the contents of the balloon on [the child's] face," and urinates and defecates on the child. The child's genital exam was "[u]nremarkable," and there were no lesions, abrasions, redness, rash, or trauma. S.B.'s urinalysis was abnormal, and she was treated for a urinary tract infection. The child tested negative for sexually transmitted infections.

In mid-August 2023, father also moved to amend custody and visitation, contending that mother was coaching the child to make false statements about sexual abuse. Shortly afterwards, father moved to Maryland.

In September 2023, the JDR court heard mother's petition for a protective order. After mother testified, she attempted to call the child to testify but eventually "conceded that the child was incompetent." Mother sought to admit recordings of the child. Based on several factors, including mother's lack of credibility, the JDR court concluded that the recordings were not reliable or

admissible. The JDR court granted father's motion to strike because there was no "reliable or admissible evidence of abuse." Mother did not appeal the JDR court's ruling.

In mid-October 2023, mother filed a petition for protection from child abuse in Maryland. Mother made allegations similar to those made to the Fairfax JDR court but included additional claims. Mother claimed that the child reported that father "painfully touch[es] [the child's] vagina," "forces his penis" into the child's mouth, "bites [the child's] nipple," "slaps [the child] on the face with his penis," records videos of the child while the child is naked, and "slaps [the child] in the face if [the child] fights back."

Father moved back to Virginia in October 2023. In early November 2023, after mother reviewed the Maryland CPS findings, she asked the court to dismiss her petition for protection.

## II. The Custody Hearing

At the custody hearing, Dr. Jenie Ferrer, the child's former pediatrician, testified that in August 2022 mother informed her that S.B. said father inappropriately touched the child's vagina. Ferrer notified CPS because she was a mandatory reporter. She did not speak with the child or father before making her report and did not recall the child initially making the statement during an appointment. Ferrer explained that it was difficult to provide care for the child because the practitioners were often "placed in the middle of . . . the parents." As a result of the "back-and-forth" between the parents during appointments, the child was removed from the practice.

Cynthia Anderson, the child's maternal grandmother, helps mother homeschool S.B. She testified that mother and child "get along well," and Anderson does not interact at all with father.

Mother testified that she was worried about the child's "propensity to talk about the abuse." She recalled that father was at a medical appointment where the child stated that "daddy touches my

vagina." Mother claimed that "[h]e acted agitated" and "[l]ike he was nervous and upset" but he did not say anything. Mother acknowledged that she never spoke with father about her concerns.

Mother stated that she did not appeal the JDR court's dismissal of her September 2023 protective order request because there was "an upcoming hearing for custody where these issues would be on the table again" and it might have been "a better venue to address [her] concerns." She recalled that a CPS report was made with authorities in Maryland sometime between September and mid-October 2023, based on the same allegations from August 2023. Mother spoke with CPS but denied making the initial report. Claiming that she had a court order, mother attempted to remove the child from the preschool she was attending during father's custody time.[4] Mother admitted that she dismissed the petition for protective order "as a result of" the contents of the CPS report.

Mother acknowledged that she and father did not engage in co-parenting counseling despite the recommendation of Sunstone Counseling. She stated that she found the idea of going to counseling "with a rapist, the person who had raped your child" to be "incredulous."

Suzanne Malveaux, father's friend, is the mother of one of S.B.'s closest friends. She testified that the children are very close, and she described father's relationship with S.B. as "very warm, very loving." Malveaux was comfortable leaving her daughter alone with father and has done "so many times." She recalled that S.B. once said that her mother told her to say, "daddy touches her vagina and puts his penis in her mouth."

S.B.'s paternal aunt, Candace Parrott, observed several custody exchanges and described mother and grandmother's demeanor during them as "contentious" and "aggressive." Parrott heard the child say that "Daddy touches my vagina," "Mommy gets angry if I don't say Daddy touches my vagina," and "Mommy gets cross and Mommy touches my vagina and [grandmother] touches

---

[4] The preschool director testified that when mother presented the document, police officers did not require her to release the child to mother.

my vagina." According to Parrott, the child usually said those things for a day or two after returning from mother's custody.

Father testified and denied ever touching S.B. inappropriately. He first learned of the allegation that he sexually abused the child at a pediatrician appointment in August 2022. Mother told the pediatrician the child was learning about anatomy, and mother "prompted" the child to make the statement. Father described the child as "hyper focused" on sexual topics since 2022. Immediately after custody exchanges, the child would say: "'Daddy touches my vagina,' or 'I have something to say, Daddy. Mommy said, "Daddy touches my vagina."'" For about a day, the child would make those kind of statements "independent of whatever [the child was] doing." Father described it like a "record that's played in [the child's] head that almost kicks back in." Father did not initially know about the emergency room visit and was concerned about possible "trauma" to the child from being "prodded and poked" by strangers, undergoing a genital exam at that age.

Father stated that he learned about the Maryland petition for protection during his custody time and voluntarily had his sister take the child to the next regularly scheduled exchange, although he had not yet been served with an order. He did not see the child again until after the hearing on the petition three weeks later. At that hearing, mother had requested the dismissal of her Maryland petition after reading the CPS report. According to father, the report reflected that mother was "encouraging [the child] to say certain words and say certain things."

### III. Trial Court's Rulings

At the conclusion of the case, the court found a material change in circumstances since the entry of the 2022 consent order.[5] The court held that along with other considerations, the parties' inability to co-parent and mother's "unfounded allegations and reports that [f]ather

---

[5] The court's letter opinion mistakenly states that mother withdrew her request to modify custody. The hearing transcript, however, demonstrates that mother withdrew her request to modify child support, not custody.

inappropriately touche[d]" the child's "private parts" constituted a material change in circumstances.

In assessing the best interests of the child under Code § 20-124.3, the court found that S.B. was "inquisitive, social, . . . bright," and "in good physical health." Yet, the child "talks about sexual matters in a manner that is inappropriate for [the child's] age and is disturbing to those who hear it." It found that mother "encouraged [c]hild to falsely allege that [f]ather has touched [her] inappropriately and [mother] purposefully arranged to have those allegations presented to 'mandatory reporters' who, under law, have the obligation to report those allegations to" CPS. The court determined that S.B.'s "unusual obsession with sexual acts" and the resulting negative impact on S.B.'s "emotional well-being" constituted "a significant mental health concern that favor[ed] a modification of custody and visitation in favor of [f]ather."

The court specifically found that mother's "testimony regarding the circumstances of [c]hild's allegation of inappropriate touching by [f]ather [was] not credible." It noted that mother's claims that father abused and continued to abuse the child, were "not independently substantiated." The court was concerned that because of mother's "repeated attempts to substantiate [her] false allegations against [f]ather," mother subjected the child "to a genital exam," treatment for conditions that she knew or should have known the child did not have, as well as multiple interviews with law enforcement and CPS. The court was "very concerned" that mother would "continue in her efforts to sever the relationship between" father and the child. Therefore, the court found that mother "demonstrate[d] an inability to properly assess and meet the [child's] emotional and physical needs."

The court awarded father sole legal and primary physical custody with supervised visitation for mother. It ordered father to immediately enroll the child in mental health

counseling and mother to undergo a mental health evaluation and comply with any treatment recommendations.

Mother moved to reconsider, and the court denied the motion.

ANALYSIS

I. Material Change in Circumstances

"In determining whether a change in custody is warranted, the trial court applies a two-part test: (1) whether a change of circumstances has occurred since the most recent custody award; and (2) whether such a change [in custody] would be in the best interests of the child." *Khalid-Schieber v. Hussain*, 70 Va. App. 219, 228 (2019) (quoting *Parish v. Spaulding*, 26 Va. App. 566, 570-71 (1998)). "'Changed circumstances' is a broad concept and incorporates a broad range of positive and negative developments in" a child's life. *Sullivan v. Jones*, 42 Va. App. 794, 806 (2004) (quoting *Parish*, 26 Va. App. at 573). "Whether a change of circumstances exists is a factual finding that will not be disturbed on appeal if the finding is supported by credible evidence." *Denise v. Tencer*, 46 Va. App. 372, 395 (2005) (quoting *Ohlen v. Shively*, 16 Va. App. 419, 423 (1993)).

Mother argues that the reasons cited by the court do not support finding a material change in circumstances. We disagree. Since the last custody order, the parties' ability to co-parent continued to deteriorate. Mother also repeatedly used the child and the legal system to make unsupported allegations that father sexually abused the child. *Wilson v. Epley*, No. 0427-07-2, slip op. at 6 (Va. Ct. App. Dec. 18, 2007); *Weaver v. Lloyd*, No. 0224-06-2, slip op. at 5-6 (Va. Ct. App. July 11, 2006).[6]

---

[6] "Although not binding precedent, unpublished opinions can be cited and considered for their persuasive value. Rule 5A:1(f)." *Otey v. Commonwealth*, 61 Va. App. 346, 350 n.3 (2012).

Further, the court noted that the child was preparing to enter kindergarten. Mother contends that the passage of time cannot constitute a material change of circumstances. She argues that "[t]he fact that the child has reached kindergarten age must be discarded in this analysis [because] it is a fact the court reasonably could have foreseen." Mother is incorrect. *See Best v. Montez*, No. 1319-18-4, slip op. at 14-15 (Va. Ct. App. May 14, 2019) (explaining that there was sufficient evidence to support a finding of a change in circumstances when "the child was starting kindergarten," which changes "the child's routine"); *see also Turner v. Turner*, 3 Va. App. 31, 36 (1986) (explaining that "the court must resolve custody proceedings . . . at a given point in time, recognizing that it may become appropriate to make a change in the future"). Thus, the record supports the court's finding of a material change in circumstances. *Denise*, 46 Va. App. at 395.

## II. Best Interests of the Child

"[T]rial courts are vested with broad discretion in making the decisions necessary to guard and to foster a child's best interests." *Khalid-Schieber*, 70 Va. App. at 228 (alteration in original) (quoting *Farley v. Farley*, 9 Va. App. 326, 328 (1990)). "A trial court's determination of a child's best interests 'is reversible on appeal only for an abuse of that discretion, and a trial court's decision will not be set aside unless plainly wrong or without evidence to support it.'" *Rubino v. Rubino*, 64 Va. App. 256, 261-62 (2015) (quoting *Farley*, 9 Va. App. at 328). "[T]here is a presumption on appeal that the trial court thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests." *D'Ambrosio v. D'Ambrosio*, 45 Va. App. 323, 335 (2005). "Where the record contains credible evidence in support of the findings made by th[e] court, we may not retry the facts or substitute our view of the facts for those of the trial court." *Bedell v. Price*, 70 Va. App. 497, 504 (2019) (quoting *Ferguson v. Stafford Cnty. Dep't of Soc. Servs.*, 14 Va. App. 333, 336 (1992)).

"In matters of custody, visitation, and related child care issues, the court's paramount concern is always the best interests of the child." *Rhodes v. Lang*, 66 Va. App. 702, 708-09 (2016) (quoting *Farley*, 9 Va. App. at 327-28). "In turn, Code § 20-124.3 lists ten factors that the court 'shall consider' in determining a child's best interests." *Rainey v. Rainey*, 74 Va. App. 359, 379 (2022) (quoting Code § 20-124.3). "On appeal, we do not reweigh the factors to see if we would have reached a different conclusion." *Wynnycky v. Kozel*, 71 Va. App. 177, 201 (2019). Significantly, "[t]his Court is bound by the credibility findings of the circuit court." *Tackett v. Arlington Cnty. Dep't of Hum. Servs.*, 62 Va. App. 296, 339 (2013).

Mother argues that the court did not fully consider the facts regarding the Code § 20-124.3 factors. She asserts that because father remained in the doctor's office and did not respond to S.B.'s statement that he touched her vagina, he adoptively admitted it as true. Mother ignores not only father's unequivocal and categorical denial of her accusations of child abuse, but the fact that the CPS complaints were all unfounded, no criminal charges were brought against father for child abuse, and the medical professionals involved in the case saw no evidence of child abuse.

Mother essentially asks this Court to re-weigh not only the Code § 20-124.3 factors but also the court's credibility and factual determinations. We may not do so. *Wynnycky*, 71 Va. App. at 201; *Tackett*, 62 Va. App. at 339. The court determined that mother's testimony about "the circumstances of [c]hild's allegation of inappropriate touching by [f]ather [was] not credible" and that mother "encouraged" the child to make false accusations to mandatory reporters. "It is well established that the trier of fact ascertains a witness' credibility, determines the weight to be given to their testimony, and has the discretion to accept or reject any of the witness' testimony." *Khalid-Schieber*, 70 Va. App. at 234 (quoting *Street v. Street*, 25 Va. App. 380, 387 (1997) (en banc)).

- 11 -

Further, the record supports the court's determination that mother told the child to make false allegations about father. Multiple witnesses' testimony and the child's statements during a forensic interview reflect that mother coached the child. S.B. stated that "Mommy gets angry if I don't say Daddy touches my vagina." Similarly, father testified that directly after exchanges the child has stated that "Mommy said, 'Daddy touches my vagina.'"

The court was not plainly wrong in crediting father's testimony and considering the effect of mother's conduct toward the child in determining the best interests of S.B. *Rubino*, 64 Va. App. at 261-62; *Tackett*, 62 Va. App. at 339.

CONCLUSION

For these reasons, we affirm the court's judgment.[7]

*Affirmed.*

---

[7] Father requests that we award him appellate attorney fees and costs. "The decision of whether to award attorney[] fees and costs incurred on appeal is discretionary." *Koons v. Crane*, 72 Va. App. 720, 742 (2021) (quoting *Friedman v. Smith*, 68 Va. App. 529, 545 (2018)). We decline to grant father's request.