COURT OF APPEALS OF VIRGINIA

Present: Judges Causey, Raphael and Senior Judge Clements
Argued at Leesburg, Virginia

VALTHEA COURTNEY FRY

                                        MEMORANDUM OPINION[*] BY

v.       Record No. 1747-22-4           JUDGE DORIS HENDERSON CAUSEY
                                            MARCH 26, 2024

DAVID SOSNOWSKI

FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Christie A. Leary, Judge

John F. Haugh (Shannon D. Lemm; Weisberg & Weisberg, P.L.L.C.,
on briefs), for appellant.

Heather L. Mehigan (Shulman, Rogers, Gandal, Pordy & Ecker,
P.A., on brief), for appellee.

Valthea C. Fry ("mother") appeals from several rulings associated with, and including, the
trial court's modification of her visitation rights with respect to her daughter with David Sosnowski
("father"). She contends that the trial court erred by ordering her to undergo a psychological
evaluation and pending the results of that evaluation, limiting her to supervised visitation with
daughter on terms set by father and counselors. Mother asserts that the evidence failed to support
the trial court's finding that she coached her daughter and interfered with her educational, mental
health, and medical providers. Mother also contends that the trial court abused its discretion by
ruling that she violated the trial court's discovery orders and by imposing sanctions in the form of
attorney fees and exclusion of her experts' evidence at the modification hearing. Moreover, mother
contests the trial court's denial of her motions for a continuance. We affirm in part, reverse in part,
and remand the case for further proceedings.

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

BACKGROUND[1]

Father filed for divorce on June 11, 2019.[2] During the divorce proceedings, the parties appeared before the trial court in a custody dispute regarding their minor daughter, then two years old. On October 22, 2019, at the conclusion of a contentious five-day hearing in which mother alleged that father had abused her and their daughter, the trial court found that mother's allegations were unfounded and awarded father primary physical custody of daughter, with the parents to share legal custody. Further, the trial court found that daughter had been "highly coached" by mother to "say negative things about [father]." The trial court granted mother visitation every other weekend and two weekdays after daycare or school. Mother was also granted a "FaceTime" call on the days daughter was not visiting mother. Both parents had permission to visit daughter at daycare, "if permitted by the daycare."

Shortly before the trial court rendered its custody decision in October 2019, mother visited daughter's pediatrician and stated that father had abused mother, including "peeing" on mother, and that daughter had told mother that father had also "peed on" daughter. A few weeks after the trial court's custody decision, the pediatrician discharged daughter from the practice. In a letter dated November 24, 2019, the pediatric practice explained that "[a] successful, and safe, patient-physician relationship depends upon the maintenance of a level of mutual trust, courtesy." It concluded that, "based upon the recent conversations and behavior displayed by

---

[1] "We view the evidence, and reasonable inferences fairly deducible therefrom, in the light most favorable to father, the prevailing party before the trial court." *Rainey v. Rainey*, 74 Va. App. 359, 368 n.1 (2022).

[2] Portions of the record in this case were sealed. Nevertheless, the appeal necessitates unsealing relevant portions of the record to resolve the issues appellant has raised. Evidence and factual findings below that are necessary to address the assignments of error are included in this opinion. Consequently, "[t]o the extent that this opinion mentions facts found in the sealed record, we unseal only those specific facts, finding them relevant to the decision in this case. The remainder of the previously sealed record remains sealed." *Levick v. MacDougall*, 294 Va. 283, 288 n.1 (2017).

[mother] towards our providers . . . [,] neither the essential level of trust nor [the] ability to mutually conduct our business in a reasoned manner exists . . . ."

On July 22, 2020, before the final divorce decree was entered, mother filed a motion to reconsider or for a new trial.[3] Among other allegations, she asserted that father had tampered with evidence and was continuing to abuse their daughter by "peeing" on her. On August 13, 2020, the trial court denied mother's motion and suspended the final decree until it could decide whether sanctions against mother were appropriate. Following a hearing, the trial court ruled that mother's motion was ungrounded and made in bad faith. Accordingly, on October 16, 2020, it awarded father approximately $20,000 in attorney fees, and the divorce became final.

On September 21, 2020, daughter's preschool forbade mother from "parking lot visits" with daughter. In May 2021, mother sought relief from the school licensing division because she believed that denying her access to her daughter while her daughter was enrolled at the daycare was unlawful. In June 2021, the daycare disenrolled daughter.

In May 2021, mother and father agreed that daughter needed therapy because she was having nightmares "every night." Clinical social worker Kathryn Bly provided therapy to daughter from May 2021 to July 2022. Initially, daughter reported to Bly that she was "having nightmares about dad peeing on her because Mom . . . was whispering Dad was peeing in her ear and that was giving her nightmares." In June 2021, daughter told daycare personnel that "Mom said I will never see Dad again."

In July 2021, Bly spoke with the daycare director, Katara Blythe, by phone. As reflected in Bly's notes, Bly learned during the call that daughter had stated, "Mommy said she will make daddy go to jail." Blythe told Bly that daughter did not want to leave school with her mother.

_____

[3] She also filed a motion to set aside the court's ruling based on fraud. Mother later withdrew that motion.

Blythe related that mother "yelled [and] cursed" and had been "banned" from school. Blythe stated that mother had "called [the] licensing [agency] multiple times—all unfounded." "[The] retaliating [sic] led to [daughter's] disenrollment."

The next month, during an August 2021 therapy session, daughter stated during play that "Dad has to go away for 40 years for his protection." Father later told Bly he had heard daughter state that "Mom was becoming so powerful that when she grows up, she could become so angry that she could kill her." Bly asked child protective services to investigate whether mother was abusing daughter by coaching her to make false allegations of abuse against father and by threatening to change her therapist. After an investigation, CPS recommended that mother refrain from attending therapy appointments and that she allow her daughter to consult with her therapist without interference. CPS also recommended that mother refrain from telling daughter that father "had done anything to her."

On August 2, 2021, father filed a motion seeking sole legal custody of daughter based on a change in circumstances. He asserted that mother "ha[d] taken active steps to interfere with and harm [daughter]'s welfare, education, and medical and health care." Father sought sole legal custody, limitation of contact between mother and child's school, medical and therapy providers, and mother's exclusion from therapy and medical appointments. He asked that the court limit mother's pickup to father's house or, alternatively, only from school or daycare at the end of school hours. Further, father asked that the court prohibit mother from filing complaints about daughter's caretakers and providers without father's consent. Father sought attorney fees, costs, and "further relief as the nature of th[e] cause . . . require[d]."[4]

_____

[4] Mother, in turn, filed a motion to amend the original custody order. Mother asked that the court award physical custody of daughter to her, with visitation for father, or alternatively, shared physical custody of daughter. Mother also requested that the parties share legal custody and decision making. The trial court's ultimate denial of mother's motion is not the subject of this appeal.

In October 2021, Bly noted that daughter reported that mother was telling her to tell Bly "that Daddy pees on her but that that is not the actual truth." By mid-November 2021, daughter became fearful of visiting mother's house and referred to her mother as a "monster." When Bly met with mother in late November 2021, mother told Bly that daughter had stated and "act[ed] out" that father was "peeing on her." Bly responded that daughter had not "acted that out" during therapy.

Between December 2021 and late January 2022, daughter told Bly that "[s]he[] [was] worried about seeing her Mom" and that "Mommy makes me have these nightmares," referring to nightmares about her father "peeing" on her. Daughter stated that her mother entered her room while she was sleeping and "whisper[ed] in [her] ear, 'Daddy pee pees on me.'"

In February 2022, Bly received a call from daughter's teacher, Mr. Kenny, relating that daughter came to school with "dark circles under her eyes" after spending the weekend with mother. Moreover, Mr. Kenny related that daughter had asked him at least 20 times to check on her so that mother "doesn't get me." Daughter reported to Bly that she was "scared" to visit mother. Bly reported her concerns to CPS because daughter's "worries and nightmares were escalating" since the first report. After an investigation, CPS issued a letter in July 2022, concluding that no further services were warranted.

Discovery

A two-day hearing on the parents' respective motions seeking modification of the existing custody and visitation terms was originally scheduled for March 2022, but was continued to August 9-10, 2022. The parties exchanged discovery requests in preparation for the hearing. Father filed three motions to compel discovery and two motions for sanctions. Following a hearing on August 5, 2022, the trial court ruled that mother had failed to comply

with its two prior orders compelling discovery and sanctioned her by ruling that her expert witnesses could not testify at the modification hearing or provide evidence.

August 9-10, 2022 Hearing

During the hearing on the parties' motions, mother admitted that she presented daughter to her pediatric practice shortly before the original custody hearing to assess a bruise on daughter's cheek. She admitted that, the month after the hearing, the pediatric practice discharged daughter based on mother's behavior toward its providers, but she denied that she had an argument with personnel there. Mother admitted further that she did not disclose the discharge to father.

Mother agreed that she had visited her daughter at daycare on days she had no visitation rights and recorded all of her interactions with the daycare personnel without their knowledge. Mother stated that she never agreed with father's selection of Bly as a therapist, but since father had ultimate decision-making authority, she believed she had no choice. Further, mother admitted that, after father was awarded primary physical custody, she hired professionals to assess daughter without consulting father in preparation of her motion to reconsider challenging the original custody decision.

Both CPS workers testified that they had investigated complaints about mother during Bly's therapy. CPS worker Micole Walker testified that she received a complaint that mother was coaching daughter to make "statements that her father had peed on her, telling her daughter that she was not going to see her father again, that they was [sic] going to change her therapist, and that . . . it was causing [daughter] to have nightmares." CPS worker Elizabeth Jaramillo testified that she investigated a complaint that mother was mentally abusing daughter.

Bly testified that daughter reported nightmares during therapy about father "peeing on her" because mother "was whispering Dad was peeing in her ear." Daughter also expressed fear

that mother was privy to what daughter was saying to Bly during their sessions. Daughter also reported nightmares about her mother "becom[ing] a judge." In March 2022, Bly provided her progress notes to mother's attorney in response to a subpoena and was deposed. That same month, daughter "stopped communicating as directly about her nightmares pretty abruptly . . . ." Daughter told Bly that she was no longer having nightmares as frequently and, if she did, the nightmares were about "My Little Pony." Two weeks before the hearing, Bly stopped treating daughter because daughter was no longer sharing as much about her nightmares. Moreover, while father reported that daughter was still having nightmares, mother stated she was not. Bly noted "there was a shift" from helping daughter with nightmares to "navigat[ing] some conflict" in the parents' relationship.

Dr. Stacey Hoffman, an expert in clinical forensics and psychology, testified that she had evaluated daughter in July 2022 and, in connection with that evaluation, she had interviewed daughter five times. Mother refused to speak with Dr. Hoffman, but Dr. Hoffman observed father with daughter and noted that he appeared very engaged and "there was a lot of laughter." In Dr. Hoffman's opinion, daughter perceived father as "a calm, consistent individual."

Dr. Hoffman opined that daughter was anxious about an "intense loyalty conflict" between her parents. Daughter did not want to anger her mother but perceived that mother would be angry if the visitation schedule did not change and that daughter was "supposed to change the schedule." Dr. Hoffman found no evidence indicating that father was coaching daughter but noted that, based on her review of the depositions and other material, "the data . . . w[as] . . . consistent" with the conclusion that mother was coaching her and "engaging in alienating behavior." Dr. Hoffman also noted that, if mother was telling daughter what to say to her therapist, that could have a "significantly negative impact upon the child." To address daughter's anxiety, Dr. Hoffman recommended that she see a qualified therapist accustomed to

handling "high conflict situations" and that an expert parent coordinator counsel the parents. But Dr. Hoffman cautioned that therapy could not resolve daughter's anxiety if the "stressor" continued to be present in her life.

Dr. Hoffman did not opine directly that mother was alienating daughter, cautioning that she did not have sufficient involvement in daughter's case to form an opinion. She explained that alienation could range from mild to severe and that, in "mild" cases, "the intervention is typically to help work with the parent or parents" and help them understand how their actions or inactions play a role in a child's distress. In "severe cases," when parents are unresponsive or unwilling to follow recommendations, Dr. Hoffman recommended removing the child from the alienating parent for 30 to 90 days, with possible supervised visitation with the alienating parent. Based on the data collected, clinicians could "determine whether or not th[e] [alienating] parent can be integrated into the child's li[f]e in a healthy way." If the alienating parent was "unwilling, [or] too impaired," then "in very rare cases . . . th[e] contact with that parent is significantly limited or supervised or some combination thereof."

Father testified that daughter began having daily nightmares in March 2021 and that they persisted for over a year. He stated that, due to mother's behavior, daughter had lost her pediatrician, her school, and her therapist. Father also expressed concern that daughter witnessed her mother recording school personnel and father, "not healthy things for anybody to see."

The trial court found that daughter suffered from anxiety "due to what she believes is her responsibility to address custody and visitation challenges at home." The trial court also found that father and daughter had "a wonderful, supportive, and nurturing relationship." It determined that mother's relationship with daughter was "fraught with problems" and that mother's interference had resulted in daughter's discharge from her pediatrician, her therapist, and her daycare. Moreover, the trial court found that mother was attempting to coach daughter into

making false accusations against her father, causing daughter to "struggle[] with attempting to pacify her mother." It noted that, despite CPS recommendations that mother not attend therapy with daughter, mother ignored the suggestion and "continue[d] to engage in behavior that suit[ed] her needs, but not necessarily those of her daughter." The trial court found that mother was "fixated on her ability to control what is going on in [daughter]'s care rather than her best interest." The trial court noted that mother did not "offer any information as to . . . how she is putting her daughter's needs first, and . . . this conflict prevents [her] from appropriately assessing and providing for [daughter]'s needs." It found that mother's "persistent attempts . . . to coach [daughter] into saying and believing that her father pees on her and in her mouth" had "been a persistent theme since the party's divorce" and that mother's testimony in that regard was not credible. Moreover, the trial court observed that mother had devoted so much time to recording her interactions with daughter that her "singular focus [wa]s her own agenda and motives," not her daughter. It found that mother's "coaching and alienating behavior" had caused daughter "emotional trauma necessitating therapeutic intervention" and that mother's actions demonstrated that she was incapable of co-parenting with father.

Based on those findings, the trial court awarded father sole legal custody of daughter. With respect to visitation, the trial court ordered mother to undergo a forensic psychological examination to assess her parenting abilities and to address "why she is putting her needs above that of her daughter's." It ruled that mother's visits with daughter would be supervised "until and unless there is a recommendation from a professional that [mother] is capable of reconciling the harm that she's causing her daughter and her behavior, and that [mother] develops a plan to prevent this from continuing to happen." The court also ordered that visitation would be supervised by a "third-party supervisor" at mother's expense and father would have the "final say" regarding the selection of the supervisor. It ruled that father would consult with the

supervisor and determine the schedule of the visits. The court observed that it did not "want to set down a specific schedule that may not work for th[e] supervisor." It also ruled that mother could have no contact with daughter's school, medical, daycare, therapy, or extra-curricular providers. Instead, father was to keep mother apprised of "developments . . . in any of those realms."

The trial court asked the parties to provide a list of potential candidates to perform the parenting evaluation, with the court making that selection. It found that daughter required therapy and that father would be responsible for the selection of the therapist, but neither parent would have access to the therapy records.

On October 20, 2022, mother filed a motion for reconsideration, a trial de novo, and for recusal of the presiding judge. On October 21, 2022, the trial court entered an order reflecting its ruling at the conclusion of the modification hearing in August 2022. On November 14, 2022, the trial court denied mother's October 2022 motion without a hearing. This appeal follows.

## ANALYSIS

### I. Modification of Visitation from Unsupervised to Supervised

"We review the trial court's decisions on custody and visitation for an abuse of discretion." *Rainey v. Rainey*, 74 Va. App. 359, 376 (2022). "A trial court 'by definition abuses its discretion when it makes an error of law.'" *Id*. at 377 (quoting *Chaney v. Karabaic-Chaney*, 71 Va. App. 431, 434 (2020)). "[W]e review the trial court's statutory interpretations and legal conclusions *de novo*." *Chaney*, 71 Va. App. at 434 (alteration in original) (quoting *Navas v. Navas*, 43 Va. App. 484, 487 (2004)). "We begin our analysis by recognizing the well-established principle that all trial court rulings come to an appellate court with a presumption of correctness." *Wynnycky v. Kozel*, 71 Va. App. 177, 192 (2019) (quoting *Stiles v. Stiles*, 48 Va. App. 449, 453 (2006)). "In matters of custody, visitation, and related child care issues, the

court's paramount concern is always the best interests of the child." *Id*. at 193 (quoting *Bedell v. Price*, 70 Va. App. 497, 504 (2019)). "A trial court's determination with regard to [custody and] visitation is reversible only upon a showing that the court abused its discretion." *Id*. (alteration in original) (quoting *Bedell*, 70 Va. App. at 504). "[A]bsent clear evidence to the contrary in the record," we presume that the trial court correctly applied the law. *Rainey*, 74 Va. App. at 377 (quoting *Milam v. Milam*, 65 Va. App. 439, 466 (2015)). With regard to factual issues, we place great weight on the trial court's decision and will not disturb it "unless plainly wrong or without evidence to support it." *Id.* "[T]his deferential standard of review 'rests on the venerable belief that the judge closest to the contest is the judge best able to discern where the equities lie.'" *Id.* (quoting *Wynnycky*, 71 Va. App. at 193).

"[T]rial courts are vested with broad discretion in making the decisions necessary to guard and to foster a child's best interests." *Khalid-Schieber v. Hussain*, 70 Va. App. 219, 228 (2019) (alteration in original) (quoting *Farley v. Farley*, 9 Va. App. 326, 328 (1990)). "When a party has filed a petition to modify an existing visitation order, the courts must apply the Supreme Court's two-pronged test enunciated in *Keel v. Keel*, 225 Va. 606 (1983), to determine whether modification of that order is proper." *Rhodes v. Lang*, 66 Va. App. 702, 709 (2016). "That test asks, 'first, has there been a change in circumstances since the most recent custody award; second, would a change in custody be in the best interests of the children.'" *Id*. (quoting *Keel*, 225 Va. at 611). "Whether a change of circumstances exists is a factual finding that will not be disturbed on appeal if the finding is supported by credible evidence." *Denise v. Tencer*, 46 Va. App. 372, 395 (2005) (quoting *Ohlen v. Shively*, 16 Va. App. 419, 423 (1993)).

A circuit court must consider the factors delineated in Code § 20-124.3 in reaching its custody and visitation decision. *Cloutier v. Queen*, 35 Va. App. 413, 425 (2001). Those factors include:

1. The age and physical and mental condition of the child, giving due consideration to the child's changing developmental needs;

2. The age and physical and mental condition of each parent;

3. The relationship existing between each parent and each child, giving due consideration to the positive involvement with the child's life, the ability to accurately assess and meet the emotional, intellectual, and physical needs of the child;

4. The needs of the child, giving due consideration to other important relationships of the child, including but not limited to siblings, peers, and extended family members;

5. The role that each parent has played and will play in the future, in the upbringing and care of the child;

6. The propensity of each parent to actively support the child's contact and relationship with the other parent, including whether a parent has unreasonably denied the other parent access to or visitation with the child;

7. The relative willingness and demonstrated ability of each parent to maintain a close and continuing relationship with the child, and the ability of each parent to cooperate in and resolve disputes regarding matters affecting the child;

8. The reasonable preference of the child, if the court deems the child to be of reasonable intelligence, understanding, age, and experience to express such a preference;

9. Any history of (i) family abuse as that term is defined in § 16.1-228; (ii) sexual abuse; (iii) child abuse; or (iv) an act of violence, force, or threat as defined in § 19.2-152.7:1 that occurred no earlier than 10 years prior to the date a petition is filed. If the court finds such a history or act, the court may disregard the factors in subdivision 6; and

10. Such other factors as the court deems necessary and proper to the determination.

Code § 20-124.3.

The trial court has discretion regarding how to weigh the factors "and 'is not "required to quantify or elaborate exactly what weight or consideration it has given to each[.]"'" *Wynnycky*,

71 Va. App. at 201 (quoting *Brown v. Brown*, 30 Va. App. 532, 538 (1999)). "On appeal, we do not reweigh the factors to see if we would have reached a different conclusion[.]" *Id.*

> [U]nless the court fails to consider the required statutory factors or applies an incorrect legal standard, a trial court's decision as to whether a change in custody [or visitation] would be in the best interests of the child is reversible on appeal only if "plainly wrong or without evidence to support it."

*Surles v. Mayer*, 48 Va. App. 146, 172 (2006) (quoting *Yopp v. Hodges*, 43 Va. App. 427, 439 (2004)).

Here, mother asserts that the trial court abused its discretion by ordering supervised visitation pending the outcome of her psychological evaluation. Her sole argument in support of this assertion is that father did not request supervised visitation in his pleadings, and therefore, the trial court lacked the authority to order the modification sua sponte. Moreover, although she does not expressly challenge the sufficiency of the evidence supporting the trial court's decision to order supervised visitation, she contends that the evidence did not support the trial court's finding that she was coaching daughter, negatively impacting daughter's mental health. Mother also asserts that the evidence did not support the trial court's finding that she interfered with daughter's school and medical providers. We disagree.

A. Sua Sponte Ruling

We have held that the circuit court may award relief not specifically requested by a party when the fashioned relief is in the child's best interests. Thus, in *D'Ambrosio v. D'Ambrosio*, 45 Va. App. 323, 336 (2005), even though neither parent specifically requested "the sole right to select [the child]'s pediatrician," the mother did ask that the court "grant any other relief it deemed just." We found no error in the trial court's decision "fashioning 'an appropriate remedy that comports with the best interest of the children, even [though it was not] specifically

requested by the mother or father.'" *Id.* at 338 (alteration in original) (quoting *Cloutier*, 35 Va. App. at 424).

Here, father's motion requested that the trial court limit mother's access to daughter in her school, medical, and counseling settings because mother's interactions with the providers in those settings was negatively affecting daughter. Despite CPS's expressly recommending that mother refrain from interfering in daughter's therapy with Bly, and despite the trial court having expressly found during the divorce proceedings that mother's abuse allegations were unfounded, mother continued to suggest to daughter that her father was abusing her. Father's motion sought to limit mother's access to daughter to controlled settings, and by ordering supervised visitation, the trial court placed similar, but stricter, guardrails on mother's interactions with daughter and her providers. Father's motion seeking modification of visitation and custody asked the trial court for "further relief as the nature of th[e] cause . . . required." Based on the record and father's general prayer for relief, we conclude that the trial court had the authority to restrict mother's visitation to supervised visitation.

B. Coaching

The trial court's decision to modify custody and visitation rested in part on its finding that mother was coaching daughter and alienating her against her father. Mother contends that the trial court's finding was not supported by the evidence. She stresses that neither CPS investigation resulted in a finding that she was coaching daughter. She emphasizes that the first CPS investigation did not recommend against mother attending daughter's therapy sessions; instead, it characterized mother as "cooperative" and recommended only that mother arrive at the outset or end of the sessions. Mother also notes that the second CPS investigation found no evidence that mother had abused daughter and noted that daughter "engaged appropriately" with her mother and "appeared happy" in her presence.

- 14 -

"It is well established that the trier of fact ascertains a witness' credibility, determines the weight to be given to their testimony, and has the discretion to accept or reject any of the witness' testimony." *Khalid-Schieber*, 70 Va. App. at 234 (quoting *Street v. Street*, 25 Va. App. 380, 387 (1997) (en banc)). Here, the trial court was entitled to place more weight on the testimony of daughter's therapist and psychologist than that of the CPS workers who did not specifically address the issue of coaching in their investigations. Bly testified that daughter repeatedly stated that mother had instructed her to report that father was abusing her, often before bed, and that daughter was having anxiety and nightmares about it. In addition, the record demonstrates that mother told daughter that she would not see her father again, causing daughter to worry that she would lose her father and to fear her mother.

Bly's account was corroborated by daughter's teacher, Mr. Kenny, and Dr. Hoffman. Mr. Kenny observed that daughter returned from weekend visits with mother exhibiting signs that she had not slept well. Dr. Hoffman testified that daughter feared mother would be angry if her visitation rights did not change and that daughter was responsible for effecting that change. After speaking with father and daughter and reviewing the depositions, Dr. Hoffman opined that the data was consistent with coaching and alienating behavior. Moreover, the first CPS investigation implicitly concluded that mother was coaching daughter when it recommended that mother refrain from telling daughter that father "had done anything to her." Thus, the record supports the trial court's finding that mother was interfering with daughter's relationship with father and her counselor by coaching daughter into alleging that father had been abusing her.

C.  Interference with School and Medical Personnel

Mother asserts that the trial court's finding that she interfered with daughter's school and medical providers was not supported by the evidence.[5]  The trial court made that finding in assessing the third factor in Code § 20-124.3, i.e., "[t]he relationship existing between each parent and each child, giving due consideration to the positive involvement with the child's life, the ability to accurately assess and meet the emotional, intellectual, and physical needs of the child."  Mother contends that Bly's discharge of daughter was attributable to the fact that daughter was no longer reporting nightmares, not to mother's interference.  Mother argues further that daughter was not disenrolled from daycare due to her misconduct, but because both parents continued to involve the daycare in their custody dispute.  She claims she "did not attend" daughter's school from November 2020 to June 2021, and therefore, the decision to disenroll daughter in June 2021 could not be attributed to her misconduct.  Although mother concedes that Blythe characterized mother's behavior as "inappropriate," she notes that Blythe did not cite any "specific statements or curse words" by mother that led to daughter's dismissal.  Moreover, mother emphasizes that daughter's teachers at her new school characterized mother's interactions with daughter as loving and appropriate.

Mother's argument ignores Bly's testimony that mother's persistent attempts to coach daughter undermined and frustrated Bly's ability to provide daughter effective psychological therapy.  Bly testified that she was so concerned about the impact of mother's conduct that Bly involved CPS on two occasions.  Bly also testified that, even after CPS recommended that mother refrain from interfering in daughter's therapy and telling daughter that father "had done something" to her, mother continued to involve herself in daughter's therapy by suggesting that

_____

[5] Mother does not challenge the trial court's decision limiting her access to daughter's school, therapy, and health care providers.

- 16 -

father was abusing her. Only after mother obtained access to daughter's therapy records and deposed Bly did daughter abruptly deny having nightmares about her parents. At that point, Bly testified that she could offer no further help to daughter because daughter was no longer sharing her feelings with Bly. Accordingly, just as daughter's pediatric practice had discharged daughter based on the lack of trust, Bly discharged daughter as her patient.

With respect to daughter's disenrollment from daycare, mother's argument ignores undisputed evidence that the daycare banned mother from the school as early as November 2020, and, according to Bly's notes of her phone conversation with Blythe, mother "yelled [and] cursed." Blythe also told Bly that mother retaliated by calling the licensing agency, leading to daughter's disenrollment. No evidence suggests that a similar ban was applied to father. Accordingly, the evidence supports the trial court's finding that mother "regularly interfere[d] with school and medical personnel overseeing [daughter]'s care" and that daughter "ha[d] been discharged from a pediatrician, a therapist, and her prior school . . . due to conflicts between [mother] and the staff at these locations."

"Because evidence supported the circuit court's factual findings that underlie the circuit court's weighing of the factors and there is nothing inherently unreasonable in its weighing of those factors, 'its ruling must be affirmed on appeal.'" *Wynnycky*, 71 Va. App. at 201 (quoting *Brown*, 30 Va. App. at 538). The trial court was entitled to rely on Bly's and Dr. Hoffman's testimony and to find their testimony credible and persuasive. In rendering its decision, the court considered each of the statutory factors and the evidence which shows a change in circumstance and on which it relied to conclude that modification of visitation was in daughter's best interest. Accordingly, the trial court did not abuse its discretion by modifying mother's visitation rights from unsupervised to supervised visitation.

## II. Delegation of Visitation Terms to Counselor and Father

Mother asserts that the trial court erred by modifying her visitation rights and restricting her to supervised visitation with daughter until a third-party counselor decided that unsupervised visitation was appropriate. She also contends that the trial court erred by delegating its authority to father and to the counselor to determine her visitation rights. We agree.

"The Virginia Code gives judges, only, the power and responsibility to make rulings in contested custody and visitation matters." *Rainey*, 74 Va. App. at 386. "A court may not delegate its authority to determine visitation to either a parent or a child." *Id.* (quoting *In re Izrael J.*, 51 N.Y.S.3d 88, 89 (N.Y. App. Div. 2017)). "Where the governing statutes squarely place the obligation to make contested visitation decisions on the judiciary, delegation of this responsibility to third parties or parents is unauthorized." *Id.*; *see also Padula-Wilson v. Wilson*, No. 1203-14-2 (Va. Ct. App. Apr. 14, 2015) (trial court erred by delegating mother's visitation rights to psychologist) (cited with approval in *Rainey*, 74 Va. App. at 385-86).[6] Accordingly, we reverse the trial court's decision with respect to mother's visitation rights and remand the case to the trial court for further proceedings.[7] *Id.* at 391.

---

[6] We cited *Padula-Wilson* and "several unpublished opinions" in *Rainey* "to provide context and clarify an issue that takes many forms and occurs with some frequency." *Rainey*, 74 Va. App. at 384 n.6.

[7] We find no merit in mother's argument that the trial court lacked authority to order supervised visitation pending the outcome of her psychological evaluation because father did not expressly seek that relief in his pleadings. As discussed herein, father explicitly asked the trial court to restrict mother's access to daughter in certain settings and included a general prayer for relief in his motion. *See Johnson v. Buzzard Island Shooting Club, Inc.*, 232 Va. 32, 36 (1986) ("[A] court in equity may properly grant appropriate relief not specifically requested" if the relief is consistent "with . . . the relief specifically sought."); *D'Ambrosio*, 45 Va. App. at 336 (even though parent did not specifically request sole authority to select child's physician, trial court had authority to grant that relief where mother included general prayer for relief and the remedy was in child's best interest). We hold only that the trial court erred by delegating the decision to a third party regarding the timing, scope, and nature of mother's visitation rights.

- 18 -

III.  Psychological Evaluation

Mother contends that the trial court erred by ordering her to undergo a forensic psychological evaluation because father never sought the evaluation in his pleadings and first included the evaluation in his prayer for relief during closing argument.  She contends that, because father's motion did not request a psychological evaluation, mother was deprived of due process because she lacked notice that the issue would be litigated and was deprived of the opportunity to present evidence on that issue.  Although mother concedes that Code § 20-124.4 allowed the trial court to order a party to undergo a psychological evaluation to assist it in determining a child's best interests, she asserts that the evaluation did not assist the court because the court abdicated its role as decision-maker regarding when and if mother would have unsupervised visitation.[8]  Finally, assuming that the trial court acted within its authority to order a psychological evaluation, mother argues that the record did not justify an evaluation.  Mother emphasizes that both social workers testified that she behaved appropriately during their family assessments and neither cited findings of abuse nor recommended a psychological evaluation.  She also stresses that Bly described her as cooperative with daughter's therapy and Dr. Hoffman did not opine that her behavior suggested a mental health issue warranting a psychological evaluation.

Code § 20-124.2(D) expressly authorizes a court deciding custody or visitation to "order an independent mental health or psychological evaluation to assist the court in its determination of the best interests of the child."  "'[I]n any child custody decision, the lodestar for the court is the best interest of the child,' and the due process rights of the parents must be tempered by this guiding principle."  *Haase v. Haase*, 20 Va. App. 671, 681 (1995) (quoting *Smith v. Pond*, 5

---

[8] Code § 20-124.4 refers to mediation.  We presume that mother intended to cite Code § 20-124.2.

- 19 -

Va. App. 161, 163 (1987)). Thus, while "the legal rights of the parent should be respected in custody proceedings . . . [w]here the interest of the child demands it, the rights of the father and mother may be disregarded." *Forbes v. Haney*, 204 Va. 712, 716 (1963).

Here, the court found that mother continued to engage in coaching and alienating behavior, ignoring the trial court's rejection of her abuse claims in the original custody proceedings and the "non disparagement" clause in the original custody order. Mother persisted in her coaching behavior against the recommendation of CPS workers and refused to participate in Dr. Hoffman's evaluation. Instead, mother repeatedly urged her daughter to claim that her father was abusing her, causing daughter great emotional distress and anxiety. Based on the record, the trial court reasonably required an independent evaluation of mother's mental health before determining if continued unsupervised visitation was in daughter's best interests. Daughter's welfare is the "paramount concern" in a motion to amend custody and visitation.[9] *Brown*, 30 Va. App. at 538 ("In deciding whether to modify a custody order, the trial court's paramount concern must be the children's best interests.").

Moreover, as discussed above, a circuit court may award relief not specifically requested by a party when the fashioned relief is in the child's best interests and the granted relief is consistent with the relief sought in the parties' pleadings. *Johnson v. Buzzard Island Shooting Club, Inc.*, 232 Va. 32, 36 (1986). Dr. Hoffman testified that a clinician could assist a parent who had resisted recommendations to modify their behavior by helping the parent understand how their actions or inactions negatively impacted the child. Despite daughter's being

---

[9] Further, "[d]ue process requires only that . . . the opportunity for a hearing must be provided, not that the party must actually have a hearing on the merits." *D'Ambrosio*, 45 Va. App. at 339 (second alteration in original) (quoting *Blinder, Robinson & Co. v. State Corp. Comm'n*, 227 Va. 24, 28 (1984)). Here, mother filed a motion to reconsider after the trial court's ruling and challenged the trial court's order for a psychological evaluation. Accordingly, she was not deprived of her due process rights.

discharged from her pediatrician, school, and therapist, mother resisted or retaliated against, rather than complied with, the conditions imposed by her daughter's providers, prompting those providers to discontinue daughter's services.

We conclude that the relief awarded here—ordering mother to undergo psychological evaluation to assess her parenting skills—is consistent with the relief requested in father's motion and with Dr. Hoffman's recommendation that a therapist could assist a parent with coaching and alienating behaviors. Accordingly, we find no abuse of discretion in the trial court's decision ordering mother to undergo such an evaluation.

### IV. Discovery Violations – Admission and Exclusion of Expert Testimony and Continuance

Mother contends that the trial court erred by permitting

> father's expert, Dr. Hoffman, to testify while hindering mother's counsel the opportunity to conduct a complete and meaningful cross examination because of the failure of father's counsel to provide any requested documents, videos etc. which were provided by the father to Dr. Hoffman and which were requested in discovery by mother's counsel.

Stressing the duty to supplement discovery responses under Rule 4:1(e)(2), mother asserts that "Dr. Hoffman should not have been permitted to testify" because father did not supplement his discovery responses. She contends that, "[a]lternatively," the trial court should have granted her a continuance so that she could review the information provided to Dr. Hoffman.

### A. Admission of Dr. Hoffman's Testimony

The record demonstrates that mother did not ask the trial court to exclude Dr. Hoffman's testimony based on alleged discovery violations. Instead, she asked only that the trial court continue the hearing so that she could have additional time to review father's discovery responses. "No ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling, except for good cause

- 21 -

shown or to enable this Court to attain the ends of justice." Rule 5A:18. "The grounds for the objection must be stated with specificity." *Harper v. Commonwealth*, 77 Va. App. 231, 249 (2023). "The prevailing purpose behind this rule is 'to enable the trial court to prevent error, to cure alleged error with prompt and decisive instruction . . . .'" *Id.* (alteration in original) (quoting *McDuffie v. Commonwealth*, 49 Va. App. 170, 177 (2006)). To satisfy Rule 5A:18, the objection "must be both *specific* and *timely*—so that the trial judge would know the particular point being made in time to do something about it." *Id.* (quoting *Bethea v. Commonwealth*, 297 Va. 730, 743 (2019)).

As mother did not object timely to Dr. Hoffman's testimony, she has waived her argument. She does not invoke any exceptions in Rule 5A:18, and we decline to apply them sua sponte. *Williams v. Commonwealth*, 57 Va. App. 341, 347 (2010). Accordingly, we decline to consider her argument.[10]

B. Denial of Continuance

We also find no merit in mother's assertion that the trial court erred by refusing to continue the August 2022 hearing to allow her more time to review father's discovery responses.[11] She contends that she was entitled to a continuance because father failed to comply

---

[10] To the extent that mother asserts that the trial court erred by denying her motion to continue the hearing based on father's alleged discovery violations, we address that issue below. Moreover, although mother's motion to reconsider challenged the admission of Dr. Hoffman's testimony, mother failed to obtain a ruling on that motion within 21 days, and therefore, there is no valid ruling for this Court to review. *See* Rule 1:1; *Williams*, 57 Va. App. at 347. Even assuming mother had obtained a ruling, her objection to the admission of an expert's testimony in a post-hearing motion came too late. *See Butler v. Stegmaier*, 77 Va. App. 115, 125-26 (2023) (arguments regarding the admissibility of evidence are untimely if raised for the first time in post-verdict motion); *Bitar v. Rahman*, 272 Va. 130, 139 (2006) (same).

[11] "The decision of whether to grant a continuance is committed to the discretion of the circuit court. We will reverse 'a circuit court's ruling on a motion for a continuance . . . only upon a showing of abuse of discretion and resulting prejudice to the movant.'" *Shah v. Shah*, 70 Va. App. 588, 593 (2019) (alteration in original) (quoting *Haugen v. Shenandoah Valley Dep't of Soc. Servs.*, 274 Va. 27, 34 (2007)).

with the February 25, 2022 scheduling order that required him to identify his exhibits before the hearing.[12]  But when mother moved for a continuance, she did not assert that father had violated the scheduling order.  When the trial court considered mother's motion, it asked whether there was a scheduling order in place, and mother represented there was not.  When the trial court denied mother's motion for a continuance, it specifically cited the lack of a scheduling order.

"A party may not approbate and reprobate by taking successive positions in the course of litigation that are either inconsistent with each other or mutually contradictory."  *Cangiano v. LSH Bldg. Co.*, 271 Va. 171, 181 (2006).  "The doctrine protects a basic tenet of fair play: No one should be permitted, in the language of the vernacular, to talk through both sides of his mouth."  *W. Refin. Yorktown, Inc. v. Cnty. of York*, 292 Va. 804, 826 (2016) (quoting *Wooten v. Bank of Am., N.A.*, 290 Va. 306, 310 (2015)).  "The approbate-reprobate doctrine is broader and more demanding than Rule 5A:18."  *Alford v. Commonwealth*, 56 Va. App. 706, 709 (2010).  Accordingly, mother has waived her argument that the trial court abused its discretion by denying her motion for a continuance.

C.  Exclusion of Mother's Experts

Mother asserts that the trial court erred by excluding her experts for two reasons.  First, she contends that the trial court erred by precluding evidence from her experts, while "permitt[ing] Dr. Hoffman to testify without father responding in full regarding his expert, reasoning that counsel could have deposed Dr. Hoffman, that selected documents were in counsel's possession, and no scheduling order was in place."  Second, while she does not dispute the trial court's finding that she violated its orders compelling discovery, mother maintains that exclusion of her experts was an unduly severe sanction that "subverted [daughter's] best interest"

---

[12] The scheduling order entered on February 25, 2022, required the parties to exchange an exhibit and witness list 15 days before trial.

by limiting the evidence needed "to make a sound decision." Mother does not develop this argument further by identifying the excluded evidence that would have assisted the trial court in protecting daughter's best interest.

We review a trial court's "ruling on the admissibility of testimony, whether expert or lay, . . . for an abuse of . . . discretion." *Emerald Point, LLC v. Hawkins*, 294 Va. 544, 553 (2017). Rule 4:12(b)(2) empowers a trial court to "sanction a party that 'fails to obey an order to provide or permit discovery.'" *Galloway v. Cnty. of Northampton*, 299 Va. 558, 563 (2021). One available sanction "is to prohibit an offending party 'from introducing designated matters in evidence,' including by preventing the party's witness from testifying." *Id.* (quoting Rule 4:12(b)(2)(B)) (other citations omitted).

When the trial court sanctioned mother, it stressed that it had ordered mother twice previously to correct the deficiencies in her discovery responses, even imposing monetary sanctions, but she had failed to do so. Based on mother's "repeated" failures to correct those deficiencies, and with the hearing only four days away, the trial court concluded that precluding mother's experts from testifying was an appropriate sanction.[13] Based on mother's repeated failures to comply with the trial court's discovery orders, we find no abuse of discretion in the trial court's sanction.[14]

---

[13] The trial court denied father's request to dismiss mother's motion to amend custody and visitation based on her discovery violation.

[14] Moreover, mother never proffered the anticipated testimony of the excluded experts until she filed her motion to reconsider after the hearing. Even then, the proffer regarding her experts was limited to two of her three experts, Dr. Stephanie Wolf and Dr. John Lefkowits, the two experts she later identified as the only experts "prepared to testify at trial." Without a timely proffer, the trial court was unable to assess whether the excluded testimony would have been relevant or even admissible. An appropriate proffer creates a record of "what the [evidence] would have been." *Holles v. Sunrise Terrace, Inc.*, 257 Va. 131, 135 (1999).

V. Continuance-Absent Witness

Mother argues that the trial court erred by denying her mid-trial motion for a continuance after one of her subpoenaed witnesses, Katara Blythe, failed to appear. She maintains that the trial court erred by declaring her unavailable to testify and admitting her deposition instead of continuing the hearing until Blythe's appearance could be secured.

Mother objected to the admission of the deposition transcript, asserting that father had failed to establish that Blythe was unavailable. She also suggested that, as she might not complete her case by the end of the second scheduled hearing day, she could subpoena Blythe "on another date." The trial court stressed that no additional time for the hearing was available. Mother assigns error to the trial court's refusal to continue the hearing to another date "when it was a fair inference that her attendance could be secured."

Mother asserts that Blythe's "testimony [would have] contradicted [father]'s allegations that [mother]'s conduct caused [daughter] to be dismissed from [daycare]." Although mother argued below that Blythe's appearance was "very necessary," she never explained how Blythe's absence prejudiced her. Nor did she proffer the testimony that Blythe would have given if the trial court had granted a continuance.

An appropriate proffer creates a record of "what the [evidence] would have been." *Holles v. Sunrise Terrace, Inc.*, 257 Va. 131, 135 (1999). It is not sufficient that a party proffer "merely his theory of the case" rather than the substance of the excluded evidence. *Tynes v. Commonwealth*, 49 Va. App. 17, 21 (2006). A proffer allows an appellate court to determine whether the exclusion of evidence prejudiced a party. *Graham v. Cook*, 278 Va. 233, 249 (2009). In this regard, the proffer provides a complete record for review. *Wyche v. Commonwealth*, 218 Va. 839, 843 (1978). As mother failed to proffer Blythe's testimony, we cannot determine whether she was prejudiced by the trial court's denial of her motion for a

continuance.  *Shah v. Shah*, 70 Va. App. 588, 593 (2019).  Accordingly, the record is insufficient for us to address her argument.

## VI.  Recusal

Mother contends that "[t]he trial court abused its discretion by denying [her] [m]otion for [r]ecusal on November 13, 2022."  The record demonstrates that mother sought the presiding judge's recusal in her post-hearing motion filed on October 20, 2022.  The trial court did not rule on the motion until November 14, 2022, beyond the 21-day deadline in Rule 1:1(a).

"All final judgments, orders, and decrees, irrespective of terms of court, remain under the control of the trial court and may be modified, vacated, or suspended for twenty-one days after the date of entry, and no longer."  Rule 1:1(a).  "Neither 'the filing of post-trial or post-judgment motions, nor the trial court's taking such motions under consideration, *nor the pendency of such motions* on the twenty-first day after final judgment is sufficient to toll or extend the running of the twenty-one day time period of Rule 1:1.'"  *Wells v. Shenandoah Valley Dep't of Soc. Servs.*, 56 Va. App. 208, 213 (2010) (quoting *Super Fresh Foods Mkts. of Va., Inc. v. Ruffin*, 263 Va. 555, 560 (2002)).  "The twenty-one-day period is only tolled after entry of a final order or judgment through entry of an order that 'expressly modifies, vacates, or suspends the judgment.'"  *Id.* (quoting *Ruffin*, 263 at 560).  "Expiration of the twenty-one day time limitation [in Rule 1:1(a)] divests the trial court of jurisdiction."  *Stokes v. Commonwealth*, 61 Va. App. 388, 392 (2013) (quoting *Ziats v. Commonwealth*, 42 Va. App. 133, 138 (2003)).  "In determining whether a circuit court retains jurisdiction over a matter when it issues a ruling, the critical event is the circuit court's entry of a written order."  *Bailey v. Commonwealth*, 73 Va. App. 250, 261-62 (2021).  It is well established that "a court speaks only through its written orders."  *Id.* at 262 (quoting *Wagner v. Shird*, 257 Va. 584, 588 (1999)) (internal quotation marks and citations omitted).

Accordingly, the trial court's order on November 14, 2022, is void because it was entered in violation of Rule 1:1. *See, e.g.*, *Kosko v. Ramser*, 299 Va. 684, 689 (2021); *Ruffin*, 263 Va. at 563. As mother failed to obtain a valid ruling on her motion, there is nothing for this Court to review. *See Minor v. Commonwealth*, 66 Va. App. 728, 738 (2016) (holding that we lacked jurisdiction to consider appeal because the trial court no longer had jurisdiction over the case when it considered defendant's motion).

## VII. Attorney Fees

"This Court reviews an award of attorney's fees for an abuse of discretion." *Koons v. Crane*, 72 Va. App. 720, 742 (2021). Mother maintains that the trial court abused its discretion by awarding father attorney fees in the amount of $102,846.76. She asserts that the trial court awarded attorney fees based in part on father "*prevail[ing] entirely on his request for modification*." Mother argues that no "prevailing party" standard applies to awards of attorney fees under Code §§ 20-79(b) and 20-99(6), the applicable statutes. She contends that, in determining the propriety of attorney fee awards, the trial court "must consider all the circumstances of the parties or the equities of the case."

Mother acknowledges that the trial court's rationale for the award was based on consideration of the "equities in this case, to include assessing the procedural history of this case and most recently the issues that have . . . permeated the litigation to include discovery issues through multiple motions to compel and multiple issues with respect to the production of discovery." Thus, she essentially concedes that the trial court *did* consider "all the circumstances of the parties or the equities of the case." Nevertheless, mother maintains that, in addition to the time father devoted to resolving discovery disputes, the trial court should have considered that "father was compelled to respond to mother's discovery request[] by court order" and that deficiencies in his responses persisted through August 9, 2022. Unlike mother's discovery

violations, however, the record contains no ruling by the trial court that father violated a court order compelling discovery. "[T]he key to a proper award of counsel fees [is] reasonableness under all of the circumstances revealed by the record." *Tyszcenko v. Donatelli*, 53 Va. App. 209, 223 (2008) (alterations in original) (quoting *McGinnis v. McGinnis,* 1 Va. App. 272, 277 (1985)). Based on the record before us, we find no abuse of discretion in the trial court's award of attorney fees.[15]

## CONCLUSION

For the reasons stated, the trial court's judgment is affirmed in part, reversed in part, and remanded for further proceedings.

*Affirmed in part, reversed in part, and remanded.*

---

[15] Both father and mother request an award of attorney fees and costs incurred on appeal. "The decision of whether to award attorney's fees and costs incurred on appeal is discretionary." *Koons*, 72 Va. App. at 742 (quoting *Friedman v. Smith*, 68 Va. App. 529, 545 (2018)). "[I]n exercising our discretion to determine whether to award appellate attorney's fees, we do not believe that the equities of this case justify such an award" of attorney fees to either party, and we deny both parties' requests for attorney fees. *Stark v. Dinarany*, 73 Va. App. 733, 757 (2021).